UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------------x

ZHOU LEI,                                    :
                                             :
                        Plaintiff,           :
                                             :   No. 23 civ. 8105
            – against –                      :
                                             :
NEW YORK CITY REGIONAL CENTER, LLC,          :
                                             :
                        Defendant.           :   **<u>COMPLAINT</u>**
                                             :
                                             :   JURY TRIAL DEMANDED
                                             :
                                             :

------------------------------------------------------------------------------------x

Zhou Lei (the "Plaintiff") ("Ms. Zhou") is an investor in George Washington Bridge Bus Station And Infrastructure Development Fund, LLC ("Dev. Fund"), by her attorneys Ford O'Brien Landy LLP, asserts the following for her Complaint, upon knowledge as to her own actions, and otherwise on information and belief on behalf of herself:

## NATURE OF THE CASE

1.     This action is brought individually by the Plaintiff, a purchaser of a membership interest in a New York limited liability company against the manager of the company, Defendant New York City Regional Center, LLC ("NYCRC" or "Defendant"). NYCRC induced Ms. Zhou to purchase her interest by promoting the investment opportunity with a stream of materially false statements and by intentionally withholding critical information and documents that would have contradicted those false statements.

2.     In the years that followed the investment, NYCRC, as manager of the Dev. Fund, consistently pursued a pattern of conduct that involved actions and omissions designed to benefit NYCRC's own economic interests, but which acted to the detriment of its non-managing members, including the Plaintiff here, as well as the LLC as a whole.  In addition, NYCRC representatives continued to make misrepresentations and critical omissions regarding Zhou Lei's investment in order to avoid detection.

3.     Ms. Zhou is a current citizen of the People's Republic of China who was induced to make a $540,500 investment in the George Washington Bridge Bus Station Redevelopment Project, ("the Project") a special purpose vehicle that was established by NYCRC for the specific purpose of lending the entirety of the capital raised to the beleaguered private developer of the Project (non-party George Washington Bridge Bus Station Development Venture LLC) which had, years earlier, entered into an agreement with the Port Authority of

2

New York and New Jersey (the "Port Authority") to expand and renovate the retail portion of the bus station in exchange for a long-term ground lease. Zhou Lei constitutes 1 of the total 144 non-managing members in the Dev. Fund.

4.     Defendant NYCRC is a U.S. Citizenship and Immigration Services ("USCIS")-approved "Regional Center." A "Regional Center" is a privately-owned LLC that is authorized to pool investments from foreign investors and use such capital to finance projects within an approved geographic region (hence the name "Regional Center") for the dual purpose of qualifying the investors for green cards under the EB-5 visa program and making a financial return for the investors. Regional Centers sometimes use the funds they raise to finance mixed-use development projects involving both commercial/retail and government-run infrastructure occupying a single space—projects such as the bus station retail space redevelopment at issue here, or the Brooklyn Arena (Barclays Center) built on top of a rail transportation hub.

5.     Under the EB-5 visa program, which is governed by USCIS regulations, foreign investors can obtain investment-based permanent resident status in the United States ("green cards") by making a $500,000 investment in a qualifying project and proving that their investment created ten full-time jobs.

6.     NYCRC as the manager of the Dev. Fund entity had duties (including a duty of candor) *only* to the non-managing members, such as the Plaintiff, and the Dev. Fund entity. But it ignored these duties in favor of its own economic interests, which were not aligned with those of the non-managing members and the Dev. Fund. In this respect, while Ms. Zhou wanted her capital to be carefully managed to optimize the possibility of a quick repayment, NYCRC's economic interest was to maintain the outstanding loans for as long as possible so it could optimize the amount of quarterly management fees it collected on the money it raised.

7.    NYCRC also had other economic interests that were not aligned with that of the Plaintiff. For instance, NYCRC had an interest in preserving its reputation as a flexible lender in the world of New York developers so that it could continue to find New York developers who would select NYCRC to raise capital via the EB-5 markets.  NYCRC further had an interest in maintaining its image in the Chinese capital market as a company that uses EB-5 funds to finance only safe investment projects so that it could continue going back to China to raise capital for multiple projects without that market learning that NYCRC's earlier projects ended in default and a loss of capital.

8.    In sum, NYCRC had a strong interest to avoid taking actions (for instance, by declaring a default on a loan) that would damage its standing in China's EB-5 market or in the world of New York developers.  NYCRC had similarly strong incentives to avoid any actions that could impair the stream of interest payments that funded the management fees it drew from the special purpose vehicles it managed, even if it foresaw a substantial risk that the non-managing members of those vehicles would lose their capital.  Similarly, NYCRC had strong financial incentives to avoid any actions that would alert investors to problems with the projects.

9.    Due to the nature of the EB-5 program, investor-immigrants are never repeat customers.  As such, once investors commit their capital to an EB-5 project, they cease to be a prospect for any future business for NYCRC, and their interests become misaligned with those of NYCRC.  While NYCRC has legal duties to protect the investors' interests above its own interests (which hinge on the successful funding of future projects and keeping capital deployed as long as possible), here NYCRC most certainly did not.

10.     Indeed, because NYCRC did not invest its own capital in the project, its tolerance for risk of loss was substantial, and not aligned with Ms. Zhou to whom NYCRC had advertised and sold as supposedly safe/conservative.

11.     And it is precisely these conflicts of interest that caused NYCRC in this case to pursue its own interests in disregard of the interests of Ms. Zhou.  In order to persuade the foreign investor to invest in an investment vehicle, NYCRC, as manager of the investment vehicle, made substantial misrepresentations regarding the state of the Project and the nature of the collateral protecting the investment vehicle's loans to the developer. Moreover, after making such misrepresentations, NYCRC, as manager of the investment vehicle, took no action on several events of default when the non-managing members' capital could still have been protected.

12.     Not only did NYCRC fraudulently induce Ms. Zhou to invest in its investment vehicle and fail to protect her interests upon the occurrence of several loan defaults, but NYCRC also failed to inform Ms. Zhou of the Project's problems after she had invested.  As a result, NYCRC was able to prolong the period during which it managed the Project and therefore prolonged the period during which it received management fees from the investment vehicle, ultimately collecting more than $20 million in fees (more than $13 million of which were management fees).

13.     In the months leading up to the COVID-19 pandemic in the U.S. (and after it had begun in China), the beleaguered developer that had borrowed the EB-5 funds from the investment vehicle declared bankruptcy at the end of October 2019.  As a result, while NYCRC made more than $20 million, Ms. Zhou has lost the entirety of her investment.

14.     In meetings with Ms. Zhou even *after* the developer sought bankruptcy protection, NYCRC continued to make substantial misrepresentations regarding the collateral pledged for the EB-5 loans.

15.     Though Zhou Lei did receive a permanent green card, this does not excuse NYCRC's actions.  The investment was real and came with an opportunity to earn interest. From her investment, approximately 8% was paid in fees and never considered capital.  As such, the Plaintiff stood to obtain an effective interest rate of nearly 3% (on capital only) for a term of eight or more years.  The immigration aspect of the investment gave NYCRC no license to make and repeat falsehoods, and no license to breach its fiduciary duties to Ms. Zhou to bolster its own (and divergent) economic interests.

## PARTIES AND RELEVANT NON-PARTIES

16.     Ms. Zhou is an individual and resident of the People's Republic of China.

17.     Non-party George Washington Bridge Bus Station Development Venture LLC ("GWB Dev. Co.") is a Delaware limited liability company registered to do business in the State of New York.  GWB Dev. Co. is not a public company and its membership interests do not trade on any exchange.

18.     GWB Dev. Co. is an affiliate of SJM Partners, Inc., the real estate company designated by the Port Authority to conduct the redevelopment of the retail portion of the George Washington Bridge Bus Station.

19.     George Washington Bridge Bus Station and Infrastructure Development Fund, LLC is a New York limited liability company.  The investor Plaintiff owns a non-managing membership interest in Dev. Fund.

20.     Dev. Fund's non-managing membership interests were marketed by NYCRC after NYCRC caused Dev. Fund to file documents with the SEC, indicating that the membership interests would not be registered under the Securities Act of 1933.

21.     Defendant NYCRC is a New York limited liability company located at 99 Hudson Street, New York, New York.  NYCRC is a U.S. promoter of EB-5 investment programs.

22.     As a "Regional Center," NYCRC solicits investments from foreigners and pools their investments in special purpose limited liability companies ("EB-5 SPVs"), of which NYCRC is always the sole managing member.  Ordinarily, NYCRC then causes the EB-5 SPV to lend its capital to a pre-selected development company for a pre-selected project that is intended to satisfy the requirements of the EB-5 program.

23.     NYCRC charges both a one-time administrative fee to its investors of approximately 8% of the sum invested, and then charges the EB5-SPV an annual management fee of 2% to 3% of funds under management.

24.     Non-party Wailian Group ("Wailian") is a Shanghai-based company that partnered with NYCRC to solicit investments from Chinese citizens.

25.     Non-party Tutor Perini Corp. ("Tutor Perini") is a general contractor headquartered in Los Angeles that, in 2013, was awarded the role of lead contractor for the Project.

26.     Non-Party Port Authority is the owner and operator of the George Washington Bridge Bus Station.

27.     Non-Party Gregg D. Hayden ("Hayden") is the Director of Global Markets for NYCRC and personally participated in the solicitation of Investor Plaintiffs at issue in this action.

28.     Non-Party Lin Wu ("Wu") is the Director of Marketing and Business Development for NYCRC and personally participated in the solicitation of Zhou Lei at issue in this action.

29.     NYCRC is the sole managing member of Dev. Fund.

## JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332.

31.     Under 28 U.S.C. § 1332, the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of a State and citizens or subjects of a foreign state. Defendant NYCRC is a citizen of New York and Plaintiff Ms. Zhou is a citizen of the People's Republic of China. The amount in controversy exceeds $75,000.

32.     This Court has personal jurisdiction over NYCRC by virtue of its business activities within the State of New York and this judicial district, including its maintenance of offices within the state, its numerous contacts with this jurisdiction, and its conduct of business in this state, including in connection with the disputes that are the subject of this action.

33.     Venue is proper because Defendant NYCRC resides in this district.  28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

*The GWB Bus Station Redevelopment Project*

34.     The George Washington Bridge Bus Station (the "Station") is located at the east end of the George Washington Bridge in Manhattan.  The Station, built on top of the Trans-Manhattan Expressway (where Interstate 95 crosses the island of Manhattan), opened in 1963.

35.     In 2005, a Port Authority study identified the Station's retail space and its bus terminal as requiring upgrades that could enhance their revenue generation.  The Port Authority determined that building additional retail in the Station could act as a catalyst to create jobs in the Washington Heights neighborhood, and also concluded that additional modifications to the facility could improve the quality and frequency of service for bus passengers.

36.     In February 2006, the Port Authority issued a request for proposals, and in December 2006 it entered into an exclusivity agreement with GWB Dev. Co., which at the time was a joint venture between Acadia-P/A GWB LLC (an affiliate of P/A Associates) and Crown GWB LLC.  Beneficial ownership of GWB Dev. Co. would later change hands.

37.     On or about October 1, 2008 – after two years of protracted negotiation with potential developers – the Port Authority finally announced a public-private partnership plan to renovate and quadruple the retail space in the Station from approximately 30,000 square feet to approximately 120,000 square feet, as well as restore and redesign the bus terminal itself to accommodate a higher volume of buses and passengers and increase the efficiency of traffic passing through the terminal.

38.     Under the initial plan, GWB Dev. Co. agreed to spend approximately $100 million to upgrade the retail space in exchange for a 49-year lease, and the Port Authority agreed to simultaneously spend approximately $78 million to upgrade the bus terminal facilities.

39.     At the time—which was the very beginning of the 2008-2011 "Great Recession" and just two weeks after the Lehman bankruptcy—the parties anticipated that financing would take time to arrange.  As a result, the parties agreed to allow 18 months to draw plans, agree on a lease, and obtain financing.

40.     The 18-month timeframe was overly optimistic, as the recession upended countless plans and expectations.

41.     At some point during that time frame, the initially-identified general contractor Skanska USA Building Inc. ("Skanska") pulled out of the Project, meaning that a new bidding process would need to be held.  In addition, ownership of GWB Dev. Co. changed to a group led by SJM Partners and Slayton Equities.

42.     In 2011, with SJM Partners as the Port Authority's new lead partner, the Project began to move forward on several fronts (but not all).

43.     In early 2011, SJM Partners decided to bypass institutional lenders and seek to finance the Project via pooled foreign investments through the EB-5 program.  To do so, it entered into an agreement with NYCRC, which agreed to raise EB-5 funds from China to loan to the Project.

44.     In or about July 2011, SJM Partners and Slayton Equities announced that the approximately $100 million renovation of the Station's retail space, and the Port Authority-financed renovation of the Station's bus terminal, would finally begin, and was slated to be completed at some point in 2013.  Around the same time, the Port Authority executed a 49-year lease with GWB Dev. Co. which permitted an extension of up to 99 years.

45.     In November 2011, SJM Partners announced that it had secured commitments from three anchor tenants to take up approximately half of the renovated space—the discount apparel seller Marshalls, Fine Fare Supermarket, and Blink Fitness.

46.     However, construction did not begin in 2011 as anticipated.

***NYCRC Establishes an EB-5-Funded LLC to Act as Lender to the Project***

47.     On approximately March 11, 2011, NYCRC established Dev. Fund, an EB5-SPV that would seek investments from investors overseas and which would pool and then loan such capital to GWB Dev. Co. to finance the upgrade of the Station's retail space.  Under the operating agreement for that LLC effective July 18, 2011, NYCRC was both the "manager" and the "initial member."

48.     Under the operating agreement, non-managing membership interests were limited to a total of 144 investors, and cost $540,500 each.  Of this amount, $500,000 was considered a capital investment, and the remaining $40,500 per membership interest was payable to NYCRC under a schedule of fees.  As such, NYCRC would be entitled to approximately $5.83 million after selling all of the membership units to investors.

49.     In addition, NYCRC was entitled to an annual management fee of 2% of total capital under management ($1.44 million/year) to be paid out of interest income.

50.     Under the operating agreement, non-managing members (including the Plaintiff) were entitled to an annual distribution of $1,250 until such time when Dev. Fund was repaid by the borrower and all capital and retained interest was distributed.

51.    All interest received by Dev. Fund that was not paid out as part of the annual management fee, operating expenses, or the annual payments to members, was to be retained until the final distribution of capital and profit.  At that point, the non-managing members were to recover their initial capital investment, plus 50% of any retained interest payments with the remainder going to NYCRC.

52.    Under the Dev. Fund operating agreement, the non-managing members "irrevocably" appointed NYCRC "to manage the business affairs of the Company, carry on the activities of the Company and to do and to perform any and all things necessary for, or incidental to or connected with carrying on the activities of the Company and represent and bind the Company."

53.    Also in July 2011, Dev. Fund entered into a "Permanent Loan Agreement" with GWB Dev. Co.  The loan agreement provided for an up-to $72 million loan, depending on how many EB-5 investors NYCRC could find during a defined "Availability Period."

54.    Absent an event of default, the loan carried an annual interest rate of 4.75%.  For a $72 million loan, this meant that Dev. Fund 1 would receive $3.42 million in interest annually, $1.44 million of which would go to NYCRC, $180,000 of which would go to the non-managing member investors as annual distributions, and the remainder of which would be used for operating expenses or be retained.

55.    The maturity date of the loan was 5 years after the final advance, but GWB Dev. Co. was provided an option to extend for 810 days.

56.    The loan agreement contained several defined events of default, including:

A.  Failure to pay interest when due;

B.  The borrower making any materially incorrect representation or warranty;

C.  The borrower becoming subject to any judgment in excess of $250,000 and not paying such judgment in 60 days (unless fully covered by insurance);

D.  The "Mortgaged Property" becoming "materially injured" by a natural event;

E.  The work not being "diligently and substantially completed" in accordance with the agreed "Project Cost Statement;" and

F.  Any material change to GWB Dev. Co.'s contracts with the Port Authority that were not approved by NYCRC in advance.

***NYCRC Engages Wailian to Assist Its Marketing Efforts in China***

57.    In or about 2011, NYCRC engaged Wailian (among others) to act as its agents for the purpose of marketing membership interests in Dev. Fund to potential investors in China.

58.    As asserted by Wailian in an action pending in the Southern District of New York, case 1:17-cv-09004-LLS, "NYCRC would prepare and provide written advertising materials for Wailian's use, which NYCRC would update over the course of the project as necessary. Then, with NYCRC's approval, Wailian would disseminate the materials provided by NYCRC and organize and finance investor seminars and other investor outreach in China, keeping NYCRC informed of the events, so NYCRC representatives could attend if desired. NYCRC also provided Wailian with approved communications to be shared with investors over the life of the project, which addressed, for example, project approval delays and other developments."

59.    NYCRC executives, including Hayden and Wu, met with Wailian, and other local agencies for the purpose of providing trainings on exactly what to say and what not

say to prospective investors.  Among other things, NYCRC instructed Wailian, and the other mainland-China-based marketing agents that during their marketing of Dev. Fund to potential investors, they should not provide or discuss any formal legal documentation regarding the investments (including an unregistered private placement memorandum).

60.    In lieu of providing potential investors with legal documents concerning the offering, NYCRC prepared and provided to its agents in China Chinese-language marketing materials that were used in meetings with potential investors.  These materials were usually color brochures and slides that provided misleading information about the investments.

61.    While a small minority of investors were provided with offering memoranda in English (which they could not understand) at some point prior to their execution of the subscription agreements, even the formal documentation contained misrepresentations.

62.    Among other things, the offering memorandum misleadingly described the scope of the "Project" in which the investors would put their money – falsely suggesting that the EB-5 investment was only a small portion of a single large government-funded project, when the retail redevelopment and infrastructure redevelopment were in fact separate, and none of the government funding would be used for the retail.  Indeed, the entire reason the Port Authority offered the lease to GWB Dev. Co. was so that it could pass off the expense of redeveloping and managing the retail space and thereby reduce the amount of government funds needed (and lock in a revenue stream for itself).

63.    In addition, the offering memorandum asserted that the construction work would be performed by Skanska AB, a Stockholm-based international construction company with global operations that would be recognizable in China.  This was false, as Skanska had already abandoned the Project and, in 2011, no replacement had even been identified.

64.    In the Summer of 2011, Zhou Lei was informed of Phase 1 of the GWB Bus Station Redevelopment Project ("the Project") by the Shanghai office of Wailian. Zhou Lei primarily communicated with Joyce Xie and Joanne Yang, employees of Wailian who provided Zhou Lei with the Subscription Agreement in English and other Project Introduction in Mandarin.

***During its China "Roadshow," NYCRC Makes Multiple Misrepresentations to Zhou Lei About the Risk of Investment by Intentionally Overstating the Collateral Provided to Investors, and Withholds Written Disclosure Materials***

65.    In the introduction described above in ¶ 64, NYCRC (through its hired marketing agent, Wailian) made the following misrepresentations to Zhou Lei:

A.   Construction on the Project had already commenced using public funds (which was false).

B.   The "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project.  (This was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million in funds it was providing for the bus terminal.  None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.)

66.    On the basis of these misrepresentations, Zhou Lei signed the subscription agreement on July 28, 2021 to become an investor. Zhou Lei was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund and the GWB Dev. Co., or that disclosed any risks relating to this

investment. Zhou Lei invested because she believed that was investing in a government-backed project with a first lien on the bus station itself.

67.     Hayden and Wu conducted trainings with NYCRC's China-based marketing agents, instructing them on what to say to potential investors to secure investments.

68.     In these trainings, Hayden spoke in English and Wu or another employee of NYCRC translated his statements into Mandarin.

69.     In these trainings, which were recorded in at least one instance, Hayden made the following statements:

    A.     *General instructions on "pre-selling" to investors:*

        (1)     "Now, it's really important to Qiaowai, obviously Vivian, as well as to New York City Regional Center that we keep all this information close to our vest while we pre-sell to clients or talk to clients because we have a launch on July 9th." Ex. 1 at 1.

        (2)     "A good rule to remember is don't answer questions [from clients] with documents.  Respond to the question as you know you are confident you've been given all the information." Ex. 1 at 6.

        (3)     "Let's control the information.  We're not sending anything out until we authorize it.  This presentation is for you to have and hold and use in in-office presentations to pre-sell your clients." Ex. 1 at 18.

    B.     *Specific information to emphasize verbally when "pre-selling" to investors:*

        (1)     "These four points, again, the hallmark of our program

should always be repeated to your clients.  All of our projects are on government-owned land.  We bring in additional political and financial support, significantly supporting your EB-5 investors' investments, as well provide specific assets and first mortgage security, creating a surplus in job creation.  All of these points are our mantra.  Repeat it all the time to your clients."  Ex. 1 at 8.

(2)      "Again, repeating again, government-owned land, minimizing risk by involving government, a lot of support.  As you know from all of our projects, we have a huge amount of government money that does not need to be repaid, something that should always be repeated to your client.  Not having to repay that money allows us to provide first mortgage security to your client."  Ex. 1 at 8.

(3)      "This is a $358 million project for the city or Port Authority of New York and New Jersey.  The project's already begun.  It's going to happen anyway regardless of EB-5. That's the significant point to make to your investors about New York City Regional Center projects."  Ex 1 at 12.

(4)      "Your collateral to the firstly sold mortgage security for your investors is the George Washington Bridge Bus Station and the retail that's created in that bus station, all assignments of rent, leases, operating accounts, furnitures, and fixtures.  Very, very good collateral in this project."  Ex. 1 at 13.

(5)    "So when your investor, who doubts everything in the world, when they come into the room, asks you, 'What if this fails,' you say to them, 'What retail tenant, what company would not want to have a store at a location with two universities, a densely populated neighborhood and 50 million cars and trucks traveling through the store every year?'  And of course, there's infrastructure work on the bridge, again, being used or performed with the capital from the government and EB-5.  Very important.  The bridge is old, it needs repair, and some of that work is going into this particular part of the project."  Ex. 1 at 13.

(6)    "Here's the money that is used to calculate job creation and we can use all of it for job creation.  It's a little bit over $277 million of government on account, $70 million from EB-5 and $11 million from SJM Partners, a hand-selected government contractor-developer by the Port Authority. . . .  [The Port Authority has] the money on account for this particular project."  Ex. 1 at 13.

(7)    "Here's the pie chart that we always like to use.  EB-5 in yellow, $70 million representing only 19% of total project costs.  Minimal risk, very low exposure, government providing $277 million plus for this particular project.  And that money is all free, does not need to be repaid.  Make no mistake and be very confident, this is not a government bond.  Bonds need to be

repaid." Ex. 1 at 14.

(8)    "As always first lease hold mortgage on the George

Washington Bridge bus station and related retail, including all

rents, leases, furniture, fixtures, and operating accounts, very

significant, very safe, its first highest priority ahead of all

government and SJM.  The safest EB-5 project on the market

today." Ex. 1 at 14.

(9)    "The government project with the New York City Regional

Center and your investor involved this recognition agreement

further states that the mortgage that we hold on the property is law

in the state of New York, very significant for your investors to

know and appreciate.  We already know of two regional centers try

to emulate us on this because it is so important and they have had

trouble getting it.  So it is a very, very good tool to sell our projects

to your investors." Ex. 1 at 15.

(10)    "Very important, as I said before, to understand the

relationship of all the parties in the project to the EB-5 investor.

[Skanska is] the fifth largest contracting company in the world.

They have bonding and insurance exceeding $7 billion and they

100% guarantee completion of this project and all of its

components.  With such an important asset to the State of New

York and New Jersey, there can be no mistake on the George

Washington Bridge or the bus station.  Their sales, their revenues,

their balance sheet has assets exceeding 16 and as high as $21 billion per year, very significant company in the world of contracting." Ex. 1 at 15.

(11)    "Collateral is the bus station and the 120,000 square feet or 11,148 square meters of retail space, the assignment of all rents and leases, operating accounts, furnitures, and fixtures." Ex. 1 at 20.

(12)    "And it's actually two buildings, as you saw in the earlier photograph, more easily seen here, the one with the funny white roof, then you have the circular plaza, and then you have the building below. That's the collateral." Ex. 1 at 21.

(13)    "I can tell you that the value of this collateral is well in excess of two times the EB-5 investment." Ex. 1 at 20.

(14)    "[I]n addition to the promissory note, [your investors have] the mortgage security that we hold against the collateral . . . . We can take that anytime they fail. All the value, and all the cash, all the leases, and everything is held in this right hand box, and it's very direct for us to have. It's the safest way to structure EB-5." Ex. 1 at 16.

(15)    "The [EB-5 loan] transaction is 19% of the total project cost, and we have a recognition agreement as well as a completion guarantee on this EB-5 project that makes it extra safe and extra secure for your investors." Ex. 1 at 20.

(16)    "The three components, the bus station, the retail, and the
bridge all have different timelines. The bridge is out towards 4
years, the bus station is a little over 2 years, and the retail is a little
longer than 2 and a half years."  Ex. 1 at 30.

70.    The specific instructions above were all false and/or misleading.  (As a
demonstrative, Exhibit 1 – a transcript of the English-language portion of the recording – is
highlighted to note every false and misleading statement made during the recorded training
session, all of which were repeated to Investors by one of NYCRC's agents and the other China-
based agents, as well, in certain instances, by Hayden and Wu in meetings with potential
investors.)

71.    As set forth in further detail below, the falsehoods that Hayden stated to
one of NYCRC's agents (as well as the other local representative agencies) were repeated in
NYCRC's instructions to potential investors and relied on to their substantial detriment.

***NYCRC Lends Dev. Fund 1's Capital to GWB Dev. Co., but Then Purposefully Fails to Act
When Events of Default Occur***

72.    Dev. Fund was fully subscribed by approximately the end of 2011, with
144 investors, including the Plaintiff.  Dev. Fund advanced its capital to GWB Dev. Co. and
NYCRC began collecting its management fees.

73.    However, no work on the Project commenced in 2011.  Indeed, the
developer had not even hired a general contractor by that time.

74.    On October 22, 2012, Superstorm Sandy caused significant damage to the
Station, which further delayed the start of construction.

75.    The damage constituted an event of default under the Dev. Fund loan agreement.  However, NYCRC did not declare a default, nor did it inform the Dev. Fund investors of the events and its reasons for not declaring a default.

76.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2012.

***Construction Finally Begins***

77.    In June 2013, GWB Dev. Co. entered into an agreement with Tutor Perini to act as the general contractor for the Project, agreeing to pay more than $100 million for construction of the Bus Station's new retail space.  In the fall of that year, construction finally began.

78.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2013.

79.    By early 2014, it became clear that the retail portion of the Project would cost at least $119 million instead of the approved cost of $102 million.  NYCRC was aware of this possibility by the third quarter of 2013.

80.    This constituted another event of default under the loan agreement. However, NYCRC did not declare a default, nor did it inform the investors in Dev. Fund of the events and its reasons for not declaring a default.

81.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2014.

***Notwithstanding GWB Dev. Co.'s Defaults Under the Loan Agreement with Dev. Fund 1,
NYCRC Solicits Additional Investors of Dev. Fund 2***

82.     Indeed, rather than declare a default in 2014 as a result of the cost

increase, NYCRC agreed to create and promote Development Fund, Phase II (Dev. Fund II) to

raise additional EB-5 funds in order to cover the shortfall.

83.     In fact, on or about September 6, 2013, in anticipation of the cost overrun

and the potential opportunity to earn additional fees, NYCRC established Dev. Fund II as a New

York limited liability company.

84.     At no time prior to October 31, 2019 did NYCRC inform the investors in

Dev. Fund about the existence of Dev. Fund II, or of NYCRC's involvement with raising

additional funds.

85.     On April 7, 2014, NYCRC prepared and executed an operating agreement

for Dev. Fund II that was substantially similar to Dev. Fund, except that the administrative fees

to NYCRC were increased to $49,000 per investor and the management fee was increased to 3%.

86.     Dev. Fund II was designed to raise a total of $19 million from 36 EB-5

investors, which would entitle NYCRC to $1,764,000 in up-front administrative fees and

$570,000 in management fees annually.

87.     However, Dev. Fund II did not loan any funds to GWB Dev. Co.  Rather,

Dev. Fund II entered into a loan agreement with GWB Leverage Lender, LLC, an entity that was

wholly owned by GWB Development Partners LLC, which was the private joint venture that

owned 91% of GWB Dev. Co.

88.     This structure allowed the NYCRC-organized Dev. Fund II to send its

capital to GWB Dev. Co. via a pass-through entity.

89.     The loan agreement with GWB Leverage Lender, LLC was substantially similar to the agreement with GWB Dev. Co.  However, it acknowledged that the GWB Leverage Lender, LLC's operating agreement contained a loan from Dev. Fund II (which is the source of its funds), and pledged all shares in GWB Leverage Lender, LLC to Dev. Fund II. Moreover, even though Dev. Fund II was not a party to the agreement, the loan agreement required that all funds be disbursed towards EB-5 qualifying expenditures.

90.     On information and belief, there is a loan agreement between Dev. Fund II and GWB Leverage Lender, LLC that contains substantially similar terms as the agreement between Dev. Fund and GWB Dev. Co., except that the collateral pledged to Dev. Fund II is merely an equity interest in GWB Dev. Co., the ultimate recipient of the funds.

91.     This structure left Dev. Fund II without any actual collateral interest, because in any bankruptcy or dissolution, the equity holders of GWB Dev. Co. would not recover until after all creditors, including unsecured creditors, were fully repaid.

92.     Once again, NYCRC engaged marketing agents in China to promote this new investment.

93.     In soliciting investments for Dev. Fund II, NYCRC did not disclose the several events of default that had already occurred under the loan agreement between Dev. Fund and GWB Dev. Co., set forth above.

94.     In soliciting investments, NYCRC stated falsely that Dev. Fund had funded a "Phase 1" of the construction of the Project which was already complete, and that Dev. Fund II would be used to fund a "Phase 2" of construction.  However, the project that Dev. Fund had agreed to fund was the complete renovation, not just a phase of it, and that renovation was not complete.  At no time did NYCRC reveal to potential investors in Dev. Fund II that the

capital raised would be used to fund a shortfall for the entire renovation.  In March 2014, when NYCRC commenced its sales efforts for Dev. Fund II, construction had only just begun.

95.    On information and belief, in marketing Dev. Fund II, NYCRC told certain prospective investors that the Phase 2 funds would be added to the same capital stack as the Phase 1 funds, and therefore would be secured by the same first-position mortgage on both the retail section of the Station as well as the bus operation areas as Dev. Fund. However, neither Dev. Fund or Dev. Fund II had any collateral rights with respect to the operational portion of the Station, and Dev. Fund II had no security rights in the real property at all. Rather, as discussed above, Dev. Fund only had a security interest in GWB Dev. Co.'s leasehold interest as well as future rents, while Dev. Fund II's loan was collateralized by a pledge of GWB Development Partners LLC's equity interest in GWB Dev. Co.  This structure—a pledge of equity in the developer/debtor—effectively subordinated the investors in Dev. Fund II behind *all* of GWB Dev. Co.'s creditors, not just Dev. Fund.

96.    NYCRC never informed the Dev. Fund investors of the existence of Dev. Fund II.  NYCRC collected its $1.44 million in management fees for 2013 from Dev. Fund and additional fees from Dev. Fund II for the partial year.

***NYCRC Lends Dev. Fund II's Capital to GWB Dev. Co., but Then Continues to Purposefully Fail to Act When Events of Default Occur in Connection with Either Dev. Fund's Loan or Dev. Fund II's Loan***

97.    In early 2015, Tutor Perini commenced a confidential arbitration against GWB Dev. Co. alleging mismanagement, defective designs, and other material deviations from the construction contract.  GWB Dev. Co. cross-claimed, blaming Tutor Perini and its subcontractors for construction delays and cost overruns.

98.    NYCRC was aware of the arbitration, but did not inform the non-managing members, including the Plaintiff, that it was occurring.

99.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2015 and its $570,000 from Dev. Fund II, for a total of $2.01 million.

100.    In March 2016, due to the many delays, the ground lease was amended by the Port Authority to defer the beginning of rent payment by 4 years and delay the anticipated completion date by approximately 6 months in exchange for a daily penalty that amounted to $880,000.

101.    In approximately April 2016, the Port Authority temporarily halted funding, as did other lenders.  GWB Dev. Co. stopped paying Tutor Perini and stopped making interest payments on some or all of its loans (but not on its EB-5 loans).

102.    All of these events constituted events of default under the Dev. Fund - GWB Dev. Co. loan agreement, as well as, on information and belief, the Dev. Fund II-GWB Leverage Lender, LLC agreement.

103.    However, NYCRC did not declare a default, nor did it inform the investors in Dev. Fund or Dev. Fund II of the events and its reasons for not declaring a default.  Indeed, in May 2016, NYCRC issued another update to investors, again touting the Project's smooth progression.

104.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2016 and its $570,000 from Dev. Fund II, for a total of $2.01 million.

105.    Although the Project was supposed to be completed by late 2016 and the terminal was supposed to be opened in late 2016 (already after several delays), these goals were not met.  During this time, GWB Dev. Co. was forced to pay a $5,000/day penalty for each day opening was delayed, until the Station finally reopened in May 2017.  However, the retail portion of the Station remained closed.  NYCRC did not inform the non-managing members of Dev. Fund or Dev. Fund II of these developments, nor take any action with respect to GWB Dev. Co.'s defaults.

106.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2017 and its $570,000 from Dev. Fund II, for a total of $2.01 million.

107.    Again in 2018, NYCRC took no actions to protect the interests of the non-managing members of Dev. Fund, such as Ms. Zhou's, or Dev. Fund II, i.e.,.  Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund for 2018 and its $570,000 from Dev. Fund II, for a total of $2.01 million.

108.    In October 2019, just before the start of the COVID-19 pandemic, GWB Dev. Co. filed for bankruptcy protection in the Southern District of New York.

109.    In meetings with investors after the bankruptcy petition was filed, NYCRC reiterated its misrepresentations regarding the collateral pledged to Dev. Fund and Dev. Fund II, in order to prevent the investors from taking any formal actions, and to conceal the falsity of their earlier misrepresentations.

110.    However, by January 2020, the COVID-19 pandemic was already a severe epidemic in China, and by March 2020, the entire world went into lockdown.  However, in mid-December 2019, certain investors retained separate counsel.  Through the efforts of counsel, many of the investors were eventually put in a position where they could share information and compare stories.  It was not until April 2021, at the earliest, that any of the investors in possession of sufficiently complete information were able to recognize that NYCRC had misled them in connection with their investment decisions, misled them in connection with the status and progress of the Project, and misled them regarding the protection their supposed security interests provided them in connection with the bankruptcy.  Ms. Zhou was not put in touch with other investors at this time to learn of NYCRC's misconduct.

111.    In an attempt to avoid litigation, NYCRC and many of the investors entered into a tolling agreement, halting the running of all applicable statutes of limitation and repose, for the period commencing on September 1, 2021 and ending on August 29, 2022 with the filing of *Wen et al. v. New York City Regional Center, LLC*, 1:22-cv-07383-LJL (S.D.N.Y 2022).  The agreement was only executed by those investors who managed to find each other and organize, as NYCRC did not inform investors whom there con-investors were.

112.    In a further attempt to prevent the investors from commencing *Wen et al. v. New York City Regional Center*, in the fall of 2021, NYCRC commenced an action on behalf of Dev. Fund 1 (as manager) against the Port Authority in New York State Supreme Court.  The complaint in that action claimed that the Port Authority was ultimately responsible for Dev. Fund's loss of capital.

113.    On information and belief, the Port Authority action was commenced and maintained to create the impression the investors would be biting the proverbial hand the feeds

them if they commenced an action against NYCRC, and to create the impression that the investors' only chance of recovering their losses was to continue to trust NYCRC. Within weeks of the date that the investors provided NYCRC with notice of their intent to commence this action, NYCRC voluntarily discontinued the action against the Port Authorities, further flouting their obligation as a fiduciary for the investors in the fund the that managed (as the Port Authority action was commenced, primarily, to protect NYCRC and not based on any serious expectation of recovery for the investors).

114.    Unfortunately for Ms. Zhou, she was unaware that many of her fellow investors joined to form a mass of plaintiffs to commence *Wen et al. v. New York City Regional Center*.

115.    After investing in the Project, Ms. Zhou received periodical progress reports from NYCRC that continued to tout the Project's supposed prosperity. In June of 2016, five years after Ms. Zhou invested in the project, she emailed Wu to inquire about the promised return on her investment.

116.    Wu responded that pursuant to the Loan Agreement, which was summarized in the Private Placement Memorandum, the last funds were released from escrow accounts and paid to the Project's borrowers in May 2015 and that the Project's borrowers plans to return the loan to the company of the fifth anniversary of the last funds being released in May 2020. After the loan amount is returned by the project borrower, the company will then immediately distribute the repayment amount to the shareholders.

117.    Relying on this representation, Ms. Zhou started requesting updates from Wu in early 2020. In response, Wu or others from NYCRC systematically provided Progress Letters, which gave general updates of the Project and indicated that it was ongoing.

118.    On May 15, 2020, in response to a question about repayment, Wu said to Ms. Zhou that "New York is under pause due to the Covid-19 pandemic.  When we have more information, we will let you know and keep you updated."

119.    At serval points in 2022, Ms. Zhou communicated with Emma Tang of NYCRC.  Ms. Tang provided sterilized/incomplete information that did not alert Ms. Zhou to the possibility that she had been lured into the investment by false statements regarding collateral and other aspects of the investment.

120.    In February 2023, Ms. Zhou reached out to Wailian's Ye Aihua on WeChat to gain insight on the status of her investment as NYCRC had only been willing to provide non-specific reassurances. Instead of assuaging Ms. Zhou's anxieties, Ye Aihua disregarded her concerns, gave short responses, mentioned that other investors were involved in a litigation against NYCRC and that Wailian otherwise did not have any update.

121.    In a last-ditch effort to figure out what happened to her investment, Ms. Zhou reached out to NYCRC's Emma Tang in March 2023 and mentioned her desire to understand the lawsuit. NYCRC ignored the question and directed Ms. Zhou to a Progress Report.

122.    Thereafter, Ms. Zhou reached out to her personal U.S. tax counsel who, in July 2023, contacted Ms. Zhou's undersigned counsel (who represent the investors in the related litigation that Ms. Zhou learned about in March 2023).

## SOLE CAUSE OF ACTION

### (Fraudulent Inducement)

123.    Plaintiff repeats and realleges the allegations of the preceding paragraphs.

124.    Plaintiff, defined above, is an investor in Dev. Fund.

125.    Plaintiff is not a sophisticated investor and NYCRC was aware of the same when it marketed Dev. Fund to her and when it reported to her on the status of her investment between 2011 and 2022.

126.    Plaintiff is not fluent in written or spoken English, and NYCRC was aware of the same when it marketed Dev. Fund to them (in Mandarin) and when it reported to them on the status of their investments between 2011 and 2022 (in Mandarin).

127.    In 2011, NYCRC, both directly and through Wailian, made each of the several misrepresentations regarding the Project and the collateral set forth above to the Plaintiff.

128.    Plaintiff relied on these misrepresentations in making her EB-5 investment in the Project through NYCRC.

129.    Between 2011 and 2012, NYCRC actively deceived the Plaintiff regarding the status of her investments in the Project by withholding material negative information (including events that constituted events of default) from all Mandarin-language, written updates to her.

130.    Due to NYCRC's active and continuing misrepresentations, Zhou Lei did not become actually aware of NYCRC's misrepresentations until around February 2023.

131.    As a result of the above, Zhou Lei has lost all of the $500,000 in capital she invested, which should have been returned with interest in the third quarter of 2020 if the investments performed (or had been structured) as NYCRC had represented (but the representations were false).

## PRAYER FOR RELIEF

WHEREFORE, Zhou Lei demands judgment against Defendant and an award of such actual damages as she shall prove at trial, but in an amount not less than $540,500 in direct damages to Zhou Lei and damages to Dev. Fund in an amount to be established at trial, plus

punitive damages, prejudgment interest at the statutory rate and for the reasonable fees, costs,

and disbursements of this action.

Dated:   New York, New York

September 13, 2022

FORD O'BRIEN LANDY LLP


*/s/ Robert S. Landy*
Robert S. Landy
Renée L. Jarusinsky
Stephen R. Halpin III
Bryan W. McCracken
275 Madison Ave.
24th Floor
New York, NY 10016
(212) 858-0040
rlandy@fordobrien.com

*Attorneys for Plaintiffs*

# EXHIBIT 1 TO COMPLAINT

**Zhou Lei vs. New York City Regional Center LLC.**

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 2:
Okay, welcome everyone. Thanks for getting online. And this is our first presentation with this technology. So I think it's going to be wonderful.

Speaker 1:
[foreign language 00:00:24]

Audience:
[foreign language 00:00:24].

Speaker 2:
I would ask that everyone take a lot of notes because we're going to go through a lot of the same material, but we're going to provide you nice features, sale points and things to mention to your clients while pre-selling this.

Speaker 1:
[foreign language 00:00:45].

Audience:
[foreign language 00:00:45].

Speaker 2:
Now, it's really important to [Chau Wei 00:01:11], obviously Vivian, as well as to New York City Regional Center that we keep all this information close to our vest while we pre-sell to clients or talk to clients because we have a launch on July 9th.

Speaker 1:
[foreign language 00:01:32].

Audience:
[foreign language 00:01:32].

Speaker 2:
And grateful as we are to be invited, we are going to help Guangzhou, the new office in the Chau Wei system launch with a very nice project.

Speaker 1:
[foreign language 00:01:59].

Speaker 2:
For all of you who have worked so hard on the east river waterfront, I have really good news. Yesterday, we were pre-approved by USCIS on the East River Waterfront project. Congratulations, and thank you.

This transcript was exported on Jun 29, 2022 - view latest version here.

Audience:
[foreign language 00:02:34].

Speaker 3:
Waterfront.

Speaker 1:
[foreign language 00:02:34].

Speaker 2:
Also, so you know, I believe Doreen has some good news with regard to the MBA.

Speaker 1:
[foreign language 00:02:48]. They already know.

Speaker 2:
Oh, sorry. That wasn't a surprise.

Speaker 1:
[foreign language 00:02:57].

Audience:
[foreign language 00:03:19].

Speaker 2:
One or two people have an open line there. I'm sorry. They should mute their phone until they have a question.

Speaker 1:
[foreign language 00:06:15].

Audience:
[foreign language 00:06:19]

Speaker 2:
Hold questions for last minute.

Audience:
[foreign language 00:06:22]

Speaker 1:
[foreign language 00:06:25].

This transcript was exported on Jun 29, 2022 - view latest version here.

Audience:

[foreign language 00:06:26]

Speaker 2:

Are they muted? Okay, good. All right. Thank you, Doreen. And we appreciate all your hard work on getting your clients to wire funds and the source of funds packages. That's very important for us to bring new and better products for you to sell for the New York City Regional Center.

Speaker 1:

[foreign language 00:06:43].

Speaker 2:

So today's presentation is a little bit like all of our presentations because all of our projects are the same.

Speaker 1:

[foreign language 00:07:08].

Speaker 2:

Washington Bridge is named after the first president of the United States. And it's located on the Upper West Side of Manhattan.

Speaker 1:

[foreign language 00:07:25].

Speaker 2:

It connects the state of New Jersey to the state of New York.

Speaker 1:

[foreign language 00:07:36].

Speaker 2:

Over the Hudson river, which is on the west side of Manhattan.

Speaker 1:

[foreign language 00:07:43].

Speaker 2:

Below the bridge on the New York side, which is the lower portion of the photograph is Columbia University and Columbia University Medical School.

Speaker 1:

[foreign language 00:07:57].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 2:
To the north or above the photograph or the white roof, other famous... Someone's not muted.

Speaker 1:
[foreign language 00:08:20].

Speaker 2:
[foreign language 00:08:32]. Above the roof, in the northern part of that neighborhood called Washington Heights is Yeshiva University, which is a famous international school spelled Y-A-S-H-I-V-A. And Washington Heights is a very heavily-populated residential area as well.

Speaker 1:
[foreign language 00:08:55].

Audience:
[foreign language 00:08:56].

Speaker 1:
[foreign language 00:09:01].

Speaker 2:
So as I said before, I'm telling a story that helps you sell this project because it's important with this photograph alone your investors to understand what they're looking at.

Speaker 1:
[foreign language 00:09:26].

Speaker 2:
The bridge is the most heavily traveled bridge in the United States. It's a two story or two level bridge, both directions, I mean, north, south, up and down, upper deck, lower deck.

Speaker 1:
[foreign language 00:09:57].

Speaker 2:
The project involves the bridge, the project involves the bus station and the transportation components of the bus station. And together with those two components, we are creating a lot of unutilized space, which will then be redeveloped into retail shops where over 50 million cars and trucks travel every year.

Speaker 1:
[foreign language 00:10:49].

Speaker 2:

This transcript was exported on Jun 29, 2022 - view latest version here.

And because the New York City Regional Center provides your investors first mortgage security on real estate is the retail real estate in the bus station building that becomes so valuable with all of this traffic over the bridge, as well as the two universities and the residential neighborhood in the area that is largely underserved by any retail in the area.

Speaker 1:

[foreign language 00:11:28].

Speaker 2:

The bridge is owned by government and the governmental agency that owns it and operates it, the bridge as well as the bus station and all these buildings rather, is the Port Authority of the state of New York and New Jersey. It's the largest port agency in the country of the United States.

Speaker 1:

[foreign language 00:12:44].

Speaker 2:

Very important. The Port Authority owns and operates all the bridges and tunnels, airports, and other transportation networks in New York City and New Jersey and collects toll money every day, cash every day. They're self-funded. They have their own money on account. All of the money going into this project is on account.

Speaker 1:

[foreign language 00:13:41].

Speaker 2:

This money is cash flow. It comes in the door every day, and they're doing several projects in the state of New York and New Jersey as we speak, some of which we hope to involve Chau Wei.

Speaker 1:

[foreign language 00:13:59].

Speaker 2:

Even though we would provide you a letter of evidence of this money from the Port Authority, please do not ask me if the money is on account because it is.

Speaker 1:

[foreign language 00:14:21].

Speaker 2:

We'll be honest, as we always do. As you know, New York City Regional center was approved in 2008 for the benefit of all of you. We're up over 850 investors in our company with five projects. And all of our I-526s so far have been approved.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 1:

[foreign language 00:15:08].

Speaker 2:

So you know that some investors I know are going to begin asking about our level of approval from USCIS.

Speaker 1:

[foreign language 00:15:18].

Speaker 2:

While you might not be able to read it on the screen, every project that we're working on right now is approved by USCIS. The project and the components of the project are qualified projects for the New York City Regional Center to do. You should not be concerned and you should be confident when you answer that question, there will be no problem.

Speaker 1:

[foreign language 00:15:49].

Speaker 2:

So when you get a question like that from an investor, you should turn it around and say to the investor, you should be very careful out there because not only are there regional centers marketing projects who are not yet approved regional centers by USCIS, they're marketing projects where they're not qualified to market those components in the project as EB-5. This is very important for you to use against your investors when they ask you that question.

Speaker 1:

[foreign language 00:17:23]

Speaker 2:

Please write these points down when I give them to you. Also, you should know that we have TEAs from the state of New York, the highest agency that we're allowed to obtain authority from on our project. That is not true of many other regional centers. Also mention that to your client because this TEA is becoming the source of issues with USCIS on job calculations.

Speaker 1:

[foreign language 00:18:55].

Speaker 2:

A good rule to remember is don't answer questions with documents. Respond to the question as you know you are confident you've been given all the information. And for such evidentiary questions or that require evidence like the TEA, you should know that New York City Regional Center has not one letter TEA, but it has two supporting letters for that TEA from the New York State Economic Development Corporation and the US Department of Labor and Statistics.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 1:

[foreign language 00:20:08].

Speaker 2:

Moving forward, as you know, we've sold out of Brooklyn Navy Yard, Steiner Studios, arena project as well, the East River Waterfront Manhattan redevelopment project, and Pier A. All very successful. New York City Regional Center once again appreciates all of your hard work, Chau Wei.

Speaker 1:

[foreign language 00:20:33].

Speaker 2:

Again, our philosophy is making it all about the green card and not about taking unnecessary risks. And we do this providing first mortgage security, specific assets as collateral, and together with government on government-owned land, we're able to generate significant job creation.

Speaker 1:

[foreign language 00:21:20].

Audience:

[foreign language 00:21:41].

Speaker 1:

[foreign language 00:21:42].

Speaker 2:

Making it safe and secure requires additional documents. So we go beyond just offering a promissory note and we provide a loan agreement as you know, a security agreement, collateral, description of the collateral and all other related documents that are required to make it safe and secure for your clients to invest in our program.

Speaker 1:

[foreign language 00:22:44].

Speaker 2:

And in our documents, the investor's legally defined as a secured investor, a point that should always be communicated to your investors when marketing our projects.

Speaker 1:

[foreign language 00:22:56].

Speaker 2:

These four points, again, the hallmark of our program should always be repeated to your clients. All of our projects are on government-owned land. We bring in additional political and financial support, significantly supporting your EB-5 investors investments, as well provide specific assets and first mortgage security, creating a surplus in job creation. All of these points are our mantra. Repeat it all the time to your clients.

Speaker 1:
[foreign language 00:23:42].

Speaker 2:
Now you know everything is the same. This particular section of the presentation is right out of the storybook. So you can essentially take the storybook on East River Waterfront and just put in the next PPT and you've got the presentation that you need to sell any client.

Speaker 1:
[foreign language 00:25:10].

Audience:
[foreign language 00:25:10].

Speaker 1:
[foreign language 00:25:10].

Audience:
[foreign language 00:25:10].

Speaker 2:
Again, repeating again, government-owned land, minimizing risk by involving government, a lot of support. As you know from all of our projects, we have a huge amount of government money that does not need to be repaid, something that should always be repeated to your client. Not having to repay that money allows us to provide first mortgage security to your client.

Speaker 1:
[foreign language 00:26:12].

Audience:
[foreign language 00:26:12].

Speaker 1:
[foreign language 00:26:12].

Speaker 2:
Now, the Brooklyn Navy Yard is a little bit different in this regard. But all of our projects and Pier A slightly, all of our projects have EB-5 money that is 30% or less of total project costs.

Speaker 1:

[foreign language 00:26:31].

Speaker 2:

While many other regional centers offer EB-5 that are 60% or more, up to 100% of total project costs.

Speaker 1:

[foreign language 00:26:49].

Speaker 2:

So all of our government capital, as it's free, eliminates a lot of the risk in the capital stack where typical EB-5 is placed. And we'll begin to start to show you how to respond to clients who mention other type projects and how you can identify risk for them.

Speaker 1:

[foreign language 00:27:21]

Speaker 2:

Very important to note that we arrive at seminars a lot of times, many times, and the investor does not know who we are or what we do.

Speaker 1:

[foreign language 00:28:05].

Speaker 2:

They don't know the relationship of New York City Regional Center to Chau Wei, to New York City government, to the investor. All of these things you should be able to inform the client to bring them at ease, because it's all very useful information to know.

Speaker 1:

[foreign language 00:28:49].

Speaker 2:

New York City Regional Center and Chau Wei are marketing partners. We cooperate with one another. We are not financially tied to one another by ownership. That's very important.

Speaker 1:

[foreign language 00:29:06].

Speaker 2:

New York City Regional Center is a lender, a bank, lending on government-owned projects to private developers to create economic activity and jobs in the city and state of New York.

Audience:

[foreign language 00:29:46].

Speaker 1:

[foreign language 00:29:46].

Audience:

[foreign language 00:29:46].

Speaker 1:

[foreign language 00:29:46].

Speaker 2:

New York City Regional Center is a preferred institutional lender for the city and the state of New York. Very important.

Speaker 1:

[foreign language 00:29:56].

Speaker 2:

We spent two years before our approval by USCIS and a year following our approval by USCIS negotiating with, using our relationships on behalf of this program with the city and state of New York to earn that status.

Speaker 1:

[foreign language 00:30:31].

Audience:

[foreign language 00:30:31].

Speaker 2:

But it's our credentials in real estate development in New York City, real estate law, real estate investment in banking, and the combination of all of that that allows us the opportunity to get...

PART 1 OF 5 ENDS [00:31:04]

Speaker 4:

... that allows us the opportunity to get free capital from the government of New York City and New York state. And this is one significant benefit that other regional centers in our area and in our country do not have. I know how other immigration firms work in China. They offer a menu of choices to the client. They don't influence them. They don't know about the regional center. They have none of this information. You have an opportunity to market to these investors everything about your firm and our firm, which enhances their experience to successfully follow the procedures and process in this program and get permanent resident status and their money back. It's so important.

Speaker 4:

Experience is a wonderful thing. It does all the talking for you. Chawei is not just any immigration firm. They've actually returned clients' money. That is such a huge selling point, and experience speaks to your success, as well, New York City Regional Center. We've developed real estate in New York City. We've done all the lending and legal work on all these projects. And New York City and New York state recognize that and give us free money. That's how powerful it is. So know all these relationships among all the parties because it's important because your competition is throwing stones. They're smearing us, and people in glass houses should not throw stones.

Speaker 4:

Now for the presentation. This is the George Washington Bridge that travels over the Hudson River connecting the state New Jersey with the state of New York. It's a transportation and infrastructure project that is the redevelopment of the George Washington Bridge Bus Station Terminal. That is the official name. It is the transformation of the George Washington Bridge Bus Station Terminal. And as your colleagues who visited New York City with us most recently know, those are not computer generated white arrows. That's the actual roof of the Georges Washington Bridge Bus Station Terminal.

Speaker 4:

It's one of the largest bus stations in New York City. And redeveloping this particular building, the traffic flow of all the buses, creating more parking and better transportation experience creates other opportunities to build out underutilized space. So try to give you a feel without having seeing it, the bus station and the bus traffic comes off the bridge up the white ramps under the roof, does their thing, waits, picks up passengers and then leaves again. And the building space underneath the roof, as well as in the lower right hand corner of the picture, is all available space for redevelopment and retail. An exceptional opportunity for real estate, a significant cash profitable real estate equation for you and your clients to participate in.

Speaker 4:

Here's the outline of the project. To the left, you see a map of Manhattan, which you're familiar with from the [inaudible 00:39:04] project. If you're looking at the photograph and at the map, you see the star on the map is where the bridge is. It crosses over Manhattan. On the upper west side of Manhattan, it is a DEA. The island of Manhattan, at that point, forms a neck with the East River and the Hudson River. You should know from the photograph that there are ingress access from the bridge on both sides of the island for the east side and the west side of Manhattan going to the highways that extend all the way downtown and around the bottom of the east side. So the heavy flow of traffic is on both riverfronts. And then the cross streets and avenues in Manhattan form a grid, and that's how people get around.

Speaker 4:

The picture to the lower right is a good picture to focus on with your clients because it shows that the bridge is two levels high, very significant, supporting over 50 million automobiles and trucks a year. And for those of you in Shanghai and Beijing and Guangzhou who were in New York recently in May and did a video, some of your offices should use that video, that was taken in the upper right hand photograph below the white roof in front. That's the vantage point that you're looking at with Jersey off to the lower right. The big picture in the middle, you're actually looking west towards the state of New Jersey and the upper portion of the photograph. And the smaller picture to the upper right, you're actually looking

This transcript was exported on Jun 29, 2022 - view latest version here.

east. The highway that this bridge connects is called Interstate 95. It's the longest highway, north-south, in the country of the United States, extending from the state of Maine all the way down through Florida. This is the main trucking route that services the East Coast of the United States and it passes right through New York City. It's a DEA, it's a wonderful project for your clients.

Speaker 4:

This particular slide shows three pictures at the bottom that is basically the redevelopment of the George Washington Bridge Bus Station. And like all of our projects, we are focused on job creation, government support, both political and financial as you know, and investor security in the form of first mortgages. This is a $358 million project for the city or port authority of New York and New Jersey. The project's already begun. It's going to happen anyway regardless of EB-5. That's the significant point to make to your investors about New York City Regional Center projects.

Speaker 4:

Since these projects are going to happen anyway, regardless of EB-5, very important to write down a note to your clients that the flow of funds is from government first while all of the EB-5 investors are being processed for their I-526, adding collateral value to your investors security all the while. Regional centers who offer product, very important to understand. Regional centers who offer product that fund a hundred percent of the project offer product that have government bonds or offer product that have a commercial bank involved. Those regional centers must raise all EB-5 funds before the project begins to fund. Very important.

Speaker 4:

If the project out there in those examples has already begun, then the regional center is funding one component with government and one component with EB-5. That is very risky. Because USCIS will catch that there has to be a connection with all the government money in the same project. This is very important for all of you to understand and explain to counter measures of competition. So there's plenty of material that I could provide all of you, that if you write down, you can provide your investor to raise doubt about other regional centers and other projects while you're selling art.

Speaker 4:

Job creation. Job creation as of six weeks ago was 38%. But three weeks ago, you should know that the multipliers using rims too as a methodology for calculating jobs, all increase in the state of New York. This is not a marketing opportunity only for George Washington Bridge Bus Station, but as you speak to your clients on the NBA, as you speak to your clients on Waterfront, as you speak to your clients on Pier A, understand that these multipliers may affect positively all of our projects, particularly on Waterfront and Pier A. So as you speak with clients to update them on little tidbits like this that are very positive for their immigration experience, hope to get additional friends and relatives involved in EB-5 with Chawei. That's how we do it.

Speaker 4:

So it's a $358 million project. We're looking for 140 in EB-5 investors or 70 million, leaving $277 million plus of government funding that is all provided by Port Authority of New York, New Jersey. And you see different perspectives of the bus station on the next slide where we discuss about the renovation of this transportation hub. Those are traffic lanes, but the bus is leading up to the bus station where they service customers and then leave again. Very busy bus station, and again, redeveloping and rewriting

This transcript was exported on Jun 29, 2022 - view latest version here.

these buses will create additional under-utilized space that will transform into a retail mall at this location, a very densely populated location that experiences very high traffic volumes.

Speaker 4:

Here is a closer look at the bus station and some of the existing space on the lower right, which is what it looks like today and what it will look like when the project is done on the lower left. And on the upper right, you have a model of what it'll look like after the project is done. This is sort of a before and after. On the left, you have what it looks like today. Very ugly, black and white. And beautiful on the right when it's finished. Very important. Your collateral to the firstly sold mortgage security for your investors is the George Washington Bridge Bus Station and the retail that's created in that bus station, all assignments of rent, leases, operating accounts, furnitures and fixtures. Very, very good collateral in this project.

Speaker 4:

As you can see, it's 120,000 square feet or almost 11,200 square units. I'll give you an idea of the tenants that are in line for this, but there's a very aggressive competition for tenants for this space because of the high traffic volumes, the two universities and the densely populated neighborhood in the area. So when your investor, who doubts everything in the world, when they come into the room, asks you, "What if this fails," you say to them, "What retail tenant, what company would not want to have a store at a location with two universities, a densely populated neighborhood and 50 million cars and trucks traveling through the store every year?" And of course, there's infrastructure work on the bridge, again, being used or performed with the capital from the government and EB-5. Very important. The bridge is old, it needs repair, and some of that work is going into this particular part of the project.

Speaker 4:

Here's the money that is used to calculate job creation and we can use all of it for job creation. It's a little bit over $277 million of government on account, $70 million from EB-5 and $11 million from SJM Partners, a hand-selected government contractor-developer by the Port Authority. Port Authority of the state of New York and New Jersey, the largest port agency, the largest government in agency in the United States. They own and operate all the transit hubs in New York and New Jersey. They take tolls every day on bridges and tunnels, taxes at airports and bus terminals. They make cash every day. They're autonomous. They have the money on account for this particular project.

Speaker 4:

So the $277 is there and will be provided for in a letter from the Port Authority of New York and New Jersey. But again, a separate government agency that collects those funds every day. They are cash rich for any of your doubting investors. And other than the George Washington Bridge Bus Station and the George Washington Bridge, these are some other examples of properties that they own and operate, namely the airport terminals that John F. Kennedy Airport, which many of you have been to, the Port Authority Plus Terminal in Manhattan and all the tunnels, including Holland Tunnel that connect the state of New Jersey with the state of New York. As always, our projects are on government [inaudible 01:00:37], and in this case, as a separate government agency owned by the Port Authority of New York, New Jersey.

Speaker 4:

This transcript was exported on Jun 29, 2022 - view latest version here.

Here's the pie chart that we always like to use. EB-5 in yellow, $70 million representing only 19% of total project costs. Minimal risk, very low exposure, government providing $277 million plus for this particular project. And that money is all free, does not need to be repaid. Make no mistake and be very confident, this is not a government bond. Bonds need to be repaid. No matter what project you're talking about, know that one fact.

PART 2 OF 5 ENDS [01:02:04]

Speaker 6:

... SJM Partners, a very significant development partner for the Port Authority of New York and New Jersey. They are handpicked by the Port Authority for their experience on government projects, namely student housing, office buildings, and retail centers.

Speaker 6:

When your investor says, they're not as big as Forest City or they're not a public company, you need to understand one important thing, and it's no different in China than it is in the United States, when working on transportation systems, particularly bridge and tunnel traffic, there is high security in China, as well as high security in the United States.

Speaker 6:

So they need three requirements for the Port Authority. One, they have the development expertise to handle this job. Two, they have experience working for the United States Army and the United States Post Office. And three, they have the reputation and security clearance to operate with the Port Authority of New York and New Jersey.

Speaker 6:

So this is a government project with SJM Partners as the hand selected developer by the Port Authority of New York, New Jersey, to perform the work and operate the retail on behalf of your investors. That should be repeated to your client, ad nauseam. Because all of our borrowers, all of our developers get compared with the last one, no matter what. And in this particular case, it's more important their relationship with government, their experience with government, and their clearance with government.

Speaker 6:

As always first lease hold mortgage on the George Washington Bridge bus station and related retail, including all rents, leases, furniture, fixtures, and operating accounts, very significant, very safe, its first highest priority ahead of all government and SJM. The safest EB-5 project on the market today.

Speaker 6:

And now you see in the center, lower center, picture a rendering of what this will look like when it's done, much more beautiful than you've seen in prior photographs. Now there are two documents that are important documents in this project and they're similar to other ones, but I'm not sure we've emphasized for made clear what these documents mean, but they're so significant to your [inaudible 01:07:42].

Speaker 6:

This transcript was exported on Jun 29, 2022 - view latest version here.

This is a government project that is dedicated to EB-5. And because the New York City Regional Center together with your investor behaves like a bank, but it's not a commercial bank, we on behalf of your investors negotiate a much stronger instrument for them to rely on. This instrument is so significant to your investor and it's the one document of the two that should be so important for you to explain to them.

Speaker 6:

As your investors, [inaudible 01:09:13] asset manager, the New York City Regional Center behaves like a bank, but is not a commercial bank, so we negotiate with government to wrap the EB-5 in a government blanket by having them underwrite the project, approve the business plan for EB-5, and approve all methodologies by which EB-5 will be repaid. They've done that and they've provided this recognition agreement to prove it.

Speaker 6:

The government project with the New York City Regional Center and your investor involved this recognition agreement further states that the mortgage that we hold on the property is law in the state of New York, very significant for your investors to know and appreciate. We already know of two regional centers try to emulate us on this because it is so important and they have had trouble getting it. So it is a very, very good tool to sell our projects to your investors.

Speaker 5:

[inaudible 01:11:27].

Speaker 6:

The second most significant document in this document set you'll find is a third party 100% completion guarantee provided by the general contractor on this project named Scansca. Very important, as I said before, to understand the relationship of all the parties in the project to the EB-5 investor. Safe to say Scansca is not a part of Chouway. They're not a part of the New York City Regional Center. They're not a part of the Port Authority. They have no relationship with SJM. They are the fifth largest contracting company in the world. They have bonding and insurance exceeding $7 billion and they 100% guarantee completion of this project and all of its components. With such an important asset to the state of New York and New Jersey, there can be no mistake on the George Washington Bridge or the bus station. Their sales, their revenues, their balance sheet has assets exceeding 16 and as high as $21 billion per year, very significant company in the world of contracting.

Speaker 6:

They are entrusted by almost every nice country in the world to do the $1 billion redevelopment of the United Nations in New York City, as well all the renovation on the Brooklyn Bridge, and most of the work being done to rebuild the World Trade Centers is all being done by Scansca, a very significant company. Now the completion guarantee that we had on the Brooklyn Arena and infrastructure project was wonderful, was great.

Speaker 5:

[inaudible 01:15:26].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 6:

That was provided by the borrower in the EB-5 transaction called Forest City Enterprises. This is better because it provides an independent objective third party, not only doing the work on the project, but using their balance sheet to guarantee that the project is completed. And this does three things for your client.

Speaker 5:

[inaudible 01:16:26].

Speaker 6:

It provides your client certainty that this project will be completed. It guarantees that all the money in the project of $358 million used to calculate jobs will be spent. And when you do that, you effectively guarantee job creation, as we've represented using the multipliers in New York today. And of course we'll use and continue to use Citibank as our escrow agent working very well with [inaudible 01:17:38] document processing and Milimar, of course, we have a still a perfect approval rate on I-5-46s, and they're coming in every day now, hopefully on all of our projects.

Speaker 6:

I think you're all familiar with our structure, but just to repeat it quickly. These two blue boxes are single purpose entity, we cause to be formed that are dedicated to the EB-5 immigration process. You need to be able to explain this to your clients. These two boxes are single purpose entities isolated and insulated from all activities of New York City Regional Center and SJM Partners, as we behave like a bank lending, 70 million to the project.

Speaker 6:

In the box on the left, your investors have all the protection of all of our documents, including the promissory note. And in addition to the promissory note, the mortgage security that we hold against the collateral, which is held in the box at the right. We can take that anytime they fail. All the value, and all the cash, all the leases, and everything is held in this right hand box, and it's very direct for us to have. It's the safest way to structure EB-5.

Speaker 6:

The arrow connecting the boxes is a secured loan transaction, 140 investors at $500,000 makes up 70 million of secured loan to the project. The money goes into the project, creates the jobs, and after five years, bank to bank transactions, the money is returned directly to the individual EB-5 investors. This is a bank loan transaction no different than the Bank of China or the Bank of New York. And again, it is authorized and approved by the Port Authority of New York with the recognition agreement, very safe, very secure.

Speaker 5:

[inaudible 01:22:20].

Speaker 6:

As you know we have other projects coming. One of the projects, again, very similar to this same four points, government land, government investment, first mortgage security specific assets, and plenty of

job creation. [inaudible 01:23:22] the government, all of our projects are the same, the project will be less than 30%, in this case 24%, less than 30% of total project costs with significant job creation and as well, a completion guarantee. And your investors will have the same team involved, Chouway, New York City Regional Center, and our asset management capabilities, our experience to shepherd them through this whole process and return their money after five years.

Speaker 6:

I think it's important for all of you to emphasize with your clients, what we have done historically in asset managing and reporting to existing investors. We provide all of the documents. We provide welcome packages, which details information about the project. Letters from government, letters from the developer. We provide updates. Letters from the developer. We provide updates from our newsletter, that update all projects and activities as well. We provide monthly progressive series of photographs that show progress on the project.

Speaker 6:

We were in Shanghai this weekend and in office seminar, very heavily populated. Everyone stayed. Everyone was focused. But when we brought out the pictures and we talked about the four different projects that have been sold out, everyone got excited, because they see a series of projects. They see a series of photographs where they see progress on real projects. Very exciting for them to see all this. And this is a very good tool for all of you to use.

Speaker 6:

All of this is meant to help you as tools to tell the story. And the photographs are the best story to tell. In the photograph that you're seeing right now, as you know, the smears try to attack us on certain things about our project. You can look at this photograph and you can tell every single client that there's work being done on all three components of this project, all at the same time, all using government funds, all using EB-5 funds, and developer funds. This one photograph can dispel many of the smears and you should use it. All we hear about is we can't do this, because someone's worried about a smear here. You see a photograph where there's work being done on all three components. It dispels over 75% of the smears.

Speaker 6:

Further, all of your offices have been to this particular site. All of your offices have been to New York City. They've taken photographs. They've taken videos of these projects, which is a completely objective view of what's happening at these projects to counter these smears. So if you come to us and you say, we've heard this smear or the client is seeing this smear on the internet, you're not using all the tools that your company and my company has provided you to overcome these objections by the client.

Speaker 6:

Again at the bottom of the photograph, subway and infrastructure being done. Top of the photograph, you have the rail yard being expanded and worked on. And then you have the arena above both of those. And if none of these, if these smears were true, why would we have I-5-26s? And then here's a money shot. You see the arena in the left hand portion down below and how close this transportation hub is to the city or the island of Manhattan, up on the top of the screen. A very good photograph to explain to your clients.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 6:

Again, we deliver government projects. They're on government land and they're supported both politically and financially by government. We involve a developer because we need the private government partnership for the better of EB-5. And that's why we are all successful. They're safe and secure and they're authorized by government-

PART 3 OF 5 ENDS [01:33:04]

Speaker 7:

They're safe and secure and they're authorized by government, and the banking transaction that we're entering into with SJM and other developers on these projects on behalf of your investors, are recognized, and blessed by government, very significant.

Speaker 8:

[foreign language 01:33:42]

Speaker 7:

So again, we appreciate your hard work, [inaudible 01:33:55], everyone out there who's worked on the MBA, Waterfront PRA. I think this is every bit as good, if not much better, than our other projects. It's a strong government project, and that's the presentation. Wish you good luck and I can answer any questions you might have.

Speaker 8:

[foreign language 01:34:15]

Speaker 7:

Let's control the information. We're not sending anything out until we authorize it. This presentation is for you to have and hold and use in in-office presentations to pre-sell your clients.

Speaker 8:

[foreign language 01:35:01]

Speaker 8:

A question from Nanjing, an investor, searching on the internet, I find a news report on February the 2nd, 2009, and saying that back at that time, there is the same TWB transportation project, and it is invested by both Port Authority and Acadia. And Port Authority allocated 152 million US dollars on that project. So the question is, are those two projects the same, or what are the relations?

Speaker 7:

No, that was before we got involved and introduced EV5. So they changed the equation to do it differently. And this is the project that was intended to be that project, this is that project now.

Speaker 8:

[foreign language 01:37:25]

Speaker 8:
So the original plan has been canceled?

Speaker 7:
Yes.

Speaker 8:
[foreign language 01:38:01].

Speaker 7:
Good question though, thank you.

Speaker 8:
[foreign language 01:38:10]

Speaker 8:
So a question from Mr. Yun in [inaudible 01:38:41]. The question is, he read an article in Shanghai Daily that there is a project in Seattle, it is also a bridge 520 bridge renovation. So in that project, there is a government fund involved. So compared with ours, what is the strength of our project?

Speaker 7:
Well, I know very little about that particular project, [inaudible 01:39:07], but you can say to people that no one at the seminar who asked a question, got an answer. Secondly, you could also say that's a very large project and the government bond is ahead of EV5. So that needs to be repaid before EV5 is repaid.

Speaker 8:
[foreign language 01:39:25]

Speaker 7:
The investor, the EV5 investor, is unsecured in that project because of the bond.

Speaker 8:
[foreign language 01:40:06]

Speaker 7:
And just as an aside, there are a few immigration firms marking that that know nothing about EV5. So all of that together is a problem.

Speaker 8:
[foreign language 01:40:26].

Speaker 8:

This transcript was exported on Jun 29, 2022 - view latest version here.

There was a question from Nanjing, because initially, they thought that the bank loan is to Skanska, the affiliate of Skanska. Then I explained, it's to SJM rather than Skanska. So their question actually is why we will lend the money to the affiliate rather than the parent company.

Speaker 7:
It's not an affiliate, it is a single purpose entity dedicated to EV5 that we caused to be formed, isolated and insulated from anything else that SJM might do in business.

Speaker 8:
[foreign language 01:42:15]

Speaker 7:
It's the easiest and most secure way to legally perfect the mortgage and take the collateral should we ever need to, which in this case, Port Authority is never going to let a group of foreign investors control the bus station.

Speaker 8:
[foreign language 01:43:04]

Speaker 8:
What is the collateral? Maybe because it's too fast for the change of the slides, they didn't see that very clearly, the collateral.

Speaker 8:
[foreign language 01:45:05]

Speaker 7:
Collateral is the bus station and the 120,000 square feet or 11,148 square meters of retail space, the assignment of all rents and leases, operating accounts, furnitures, and fixtures.

Speaker 8:
[foreign language 01:45:52]

Speaker 7:
I can tell you that the value of this collateral is well in excess of two times the EV5 investment.

Speaker 8:
[foreign language 01:46:12]

Speaker 7:
The transaction is 19% of the total project cost, and we have a recognition agreement as well as a completion guarantee on this EV5 project that makes it extra safe and extra secure for your investors.

Speaker 8:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 01:46:33]

Speaker 8:

This is the original PPT, we make the changes. [foreign language 01:47:04].

Speaker 8:

The question is that in China, maybe the bus station belong to the government, so it's different in the US. So it's hard to convince the investor that we can use this first lease hold mortgage against this bus station.

Speaker 7:

Okay. So as you know, the New York City Regional Center does real estate projects. This building, which happens to have on its roof, bus traffic, this building is worth more than two to one to your EV5 investors' investment. Pure and simple. That's the answer.

Speaker 8:

[foreign language 01:48:23]

Speaker 7:

And it's actually two buildings, as you saw in the earlier photograph, more easily seen here, the one with the funny white roof, then you have the circular plaza, and then you have the building below. That's the collateral.

Speaker 8:

[foreign language 01:49:06]

Speaker 7:

So the real value of this real estate transaction is the location where 50 million cars and trucks travel and service this retail, as well as two universities and a densely populated neighborhood. This retail will be very valuable, a lot of cash flow, and you'll appreciate it when you see it.

Speaker 8:

[foreign language 01:49:50]

Speaker 7:

The only place where the buses roll are on the roof. Your colleagues in other offices can attest to that and when you see their videos, it's the buses on the roof, and only on the roof, where they'll be parked that may be confusing you.

Speaker 8:

[foreign language 01:50:35]

Speaker 7:

This transcript was exported on Jun 29, 2022 - view latest version here.

So when you talk about collateral with your clients, this is a real estate project in a AAA location with demographics so powerful that it would even outdo any location in China.

Speaker 8:

[foreign language 01:51:02] The Chinese investor will confuse the why the government is willing to give the bus station as part of the collateral.

Speaker 7:

They're leasing it for 99 years. It's not a give. Remember, they're leasing it [inaudible 01:53:22] effective ownership for SJM that allows us to mortgage it. So it's a right to use for 99 years. The buses come up this ramp, they travel under the roof, they turn around, and then they leave again

Speaker 8:

[foreign language 01:53:36]

Speaker 7:

Only they go over the real estate, and then they get on and off the buses, all those people access the stores down below and over here.

Speaker 8:

[foreign language 01:53:46]

Speaker 7:

I can get a better, I can get a different graphic for you to explain it, if you want.

Speaker 8:

[foreign language 01:54:09].

Speaker 7:

With the collateral, the government, the recognition agreement, the completion guarantee, I don't know why you'd need it and have such a hard time explaining it. But if it's cultural, then we'll fix it.

Speaker 8:

[foreign language 01:54:23]

Speaker 7:

So the buses effectively go up and over the real estate.

Speaker 8:

[foreign language 01:54:47] So if anything should go wrong, what can we do with this bus station?

Speaker 7:

It's retail stores. You're getting all the stores. It's a retail mall.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 8:

[foreign language 01:55:20] The question is, again, if anything [inaudible 01:55:46], what can we do with that? We know what we can do with the stores, but what we can do with the bus station?

Speaker 7:

The buses have to go over the building, over the real estate, right? But the roof is a part of the real estate, so that's why you get the bus station and all of the retail stores as collateral. It's a lease, which is a right to use at a discounted rate, very inexpensive for SJM. So you have a lot of value for the actual real estate asset value, then you have the cash value that cash flows from all the retail stores. Very significant. 50 million people cross through this passage way every year, plus the two universities and all the people that live in the area that need this retail.

Speaker 8:

[foreign language 01:58:01]

Speaker 7:

We'll present it differently. Interesting, I [inaudible 01:58:11] so compelling. I'm shocked.

Speaker 8:

[foreign language 01:58:16] They are not challenging you or they [inaudible 01:58:22]-

Speaker 7:

I know. No, no, I know. I'm just [inaudible 01:58:23]-

Speaker 8:

They just want to know what the investors can do with the bus station if this project failed.

Speaker 7:

We can close it all down and put more stores. That wouldn't be what fails the project, the bus station. That's not going away.

Speaker 8:

[foreign language 01:58:48]

Speaker 7:

The bus station, that is the demand generator, that makes the stores so successful.

Speaker 8:

[foreign language 01:58:57]

Speaker 7:

It's a free delivery service of people who are willing to spend money at your store that we don't have to pay for, but yet we get the asset value and the cash value of all of that activity.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 8:

[foreign language 01:59:18]

Speaker 8:

Now they understand.

Speaker 8:

[foreign language 01:59:48]

Speaker 8:

He said that we should remember that Port Authority has issued the recognition guarantee. So when they feel comfortable that SJM can repay the investors, they will issue that guarantee. So we shouldn't think of even that way, anything will not go right.

Speaker 7:

[inaudible 02:01:20] You're the best.

Speaker 8:

[foreign language 02:01:29]

Speaker 8:

And he says that just, not because [inaudible 02:02:05] has some doubts about this, we fully trust you. It's just that we need a better explanation to the investors.

Speaker 7:

And we'll get you one. No, I understand that. I understand that.

Speaker 8:

Oh, they understand. And they-

Speaker 7:

It's not that the investors would culturally have an issue with the buses and the retail together, because that's foot traffic, that's money in the bank that adds value to the collateral for your investor.

Speaker 8:

Now they understand your answer.

Speaker 7:

Yeah.

Speaker 9:

[foreign language 02:02:37]

This transcript was exported on Jun 29, 2022 - view latest version here.

PART 4 OF 5 ENDS [02:04:04]

Speaker 10:
[foreign language 02:04:00].

Speaker 11:
[foreign language 02:05:13].

Speaker 10:
[foreign language 02:05:15].

Speaker 11:
[foreign language 02:05:19].

Speaker 10:
[foreign language 02:05:21]. [crosstalk 02:05:27].

Speaker 12:
[foreign language 02:06:00].

Speaker 11:
[foreign language 02:06:02]. [crosstalk 02:06:11].

Speaker 10:
[foreign language 02:06:03].

Speaker 12:
[foreign language 02:09:24].

Speaker 10:
[foreign language 02:09:25].

Speaker 11:
[foreign language 02:11:51]. [crosstalk 02:11:52].

Speaker 10:
[foreign language 02:11:52]. [crosstalk 02:15:15].

Speaker 12:
[foreign language 02:15:22].

Speaker 10:
[foreign language 02:15:22].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 11:

[foreign language 02:15:46].

Speaker 10:

[foreign language 02:15:46].

Speaker 11:

[foreign language 02:17:17]. [crosstalk 02:17:17].

Speaker 10:

[foreign language 02:17:20].

Speaker 12:

[foreign language 02:19:00].

Speaker 11:

[foreign language 02:19:00].

Speaker 10:

[foreign language 02:19:02].

Speaker 11:

[foreign language 02:19:03].

Speaker 13:

[foreign language 02:19:03].

Speaker 11:

[foreign language 02:19:05]. [crosstalk 02:19:08].

Speaker 14:

[foreign language 02:19:09]. [crosstalk 02:19:31].

Speaker 11:

[foreign language 02:19:35].

Speaker 12:

[foreign language 02:19:38].

Speaker 14:

[foreign language 02:19:44].

Speaker 11:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 02:19:45] actual example.

Speaker 10:
Helen.

Speaker 11:
Hey.

Speaker 10:
[foreign language 02:19:58].

Speaker 11:
[foreign language 02:20:00].

Speaker 10:
[foreign language 02:20:01] actual example [foreign language 02:20:03].

Speaker 11:
Oh.

Speaker 10:
[foreign language 02:20:10].

Speaker 11:
Oh.

Speaker 10:
[foreign language 02:20:16] actual example [foreign language 02:20:17] rank 2. Rank 2 [foreign language 02:20:32] actual example.

Speaker 11:
[foreign language 02:20:36].

Speaker 10:
[foreign language 02:20:38] actual example. Actual [foreign language 02:20:45].

Speaker 11:
[foreign language 02:23:09].

Speaker 10:
[foreign language 02:23:11].

Speaker 13:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 02:24:29].

Speaker 11:
[foreign language 02:24:33].

Speaker 10:
Okay [foreign language 02:24:37] New York and New Jersey. [Foreign language 02:24:59].

Speaker 10:
[Crosstalk 02:25:09].

Speaker 10:
[foreign language 02:25:11].

Speaker 15:
Oh, okay. [foreign language 02:25:16].

Speaker 10:
[foreign language 02:25:18] university [foreign language 02:25:19].

Speaker 15:
Yeah. [foreign language 02:25:22].

Speaker 10:
[foreign language 02:25:22].

Speaker 15:
[foreign language 02:25:31].

Speaker 10:
[foreign language 02:25:34].

Speaker 16:
Would you please spell the Yeshiva University once again? Y-A...

Speaker 12:
Y-E-S-H-I-V-A.

Speaker 10:
I-V-A. Y-E-S-H-I-V-A. Yeshiva. Yeshiva [foreign language 02:25:52].

Speaker 17:
Famous international university, predominately of the Jewish faith.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 10:
[foreign language 02:26:05].

Speaker 16:
Mm. Ah.

Speaker 12:
Highly acclaimed university in New York, as you might understand.

Speaker 15:
[foreign language 02:26:15].

Speaker 11:
[foreign language 02:26:19].

Speaker 16:
When did this project start?

Speaker 12:
I'll get you the date. I don't know exactly.

Speaker 10:
[foreign language 02:26:30].

Speaker 11:
[foreign language 02:26:36].

Speaker 10:
[foreign language 02:26:47]. [crosstalk 02:26:52].

Speaker 11:
[foreign language 02:26:56].

Speaker 10:
[foreign language 02:27:08].

Speaker 11:
[foreign language 02:27:08].

Speaker 10:
[foreign language 02:27:09].

Speaker 11:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 02:27:55].

Speaker 10:
[foreign language 02:27:56].

Speaker 18:
[foreign language 02:28:04]. Right. When will the project finish?

Speaker 12:
The three components, the bus station, the retail and the bridge all have different timelines. The bridge is out towards 4 years, the bus station is a little over 2 years, and the retail is a little longer than 2 and a half years.

Speaker 10:
[foreign language 02:28:32].

Speaker 11:
[foreign language 02:29:03].

Speaker 16:
Another question about the money put in by Port Authority, the 277.2 million. On the internet, they say that in 2008 they have already dedicated, like, 70 million. Will that be apart of the 277 or not?

Speaker 17:
No. Anything you read on the internet is not true. First of all, it's five years ago, or four years ago. Second, it's a completely different project, with different parties, and different needs. Back then, the need to redevelop the bridge was not real at that moment.

Speaker 10:
[foreign language 02:30:02].

Speaker 11:
[foreign language 02:30:02].

Speaker 10:
[foreign language 02:30:03].

Speaker 11:
[foreign language 02:30:05].

Speaker 10:
[foreign language 02:30:22].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 11:
[foreign language 02:30:22].

Speaker 19:
[foreign language 02:30:30].

Speaker 10:
[foreign language 02:30:37]. [crosstalk 02:30:44].

Speaker 16:
It's stated in a letter from Port Authority to [inaudible 02:30:52]. The jury said they will go back and review the document, and [inaudible 02:31:00].

Speaker 20:
[foreign language 02:31:07]. [crosstalk 02:31:11].

Speaker 17:
I think it's important for Cha Wei to know understand, EB-5, it gives New York City, New York State and the Port Authority a different opportunity to go to the federal government to generate more federal funding for our region of the country.

Speaker 10:
[foreign language 02:31:45].

Speaker 17:
We've been managing, discussing, negotiating and putting together this project since 2008, and when we came along, that gave the Port authority to structure a different deal involving the bridge, and the level of work that needs to be done to both the bridge, and the bus station.

Speaker 10:
[foreign language 02:32:26].

Speaker 17:
So [foreign language 02:32:29] on the internet stories.

Speaker 10:
[foreign language 02:32:33].

Speaker 11:
[foreign language 02:32:38].

Speaker 10:
[foreign language 02:32:40].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 11:

[foreign language 02:32:42].

Speaker 19:

[foreign language 02:33:34].

Speaker 10:

[foreign language 02:33:36].

Speaker 11:

[foreign language 02:34:02].

Speaker 10:

[foreign language 02:34:03].

Speaker 17:

[inaudible 02:34:08]. Okay, cool. Thanks [inaudible 02:34:16].

Speaker 11:

[foreign language 02:34:19].

PART 5 OF 5 ENDS [02:34:33]